Case No. 24-1224, et al. Sprint Corporation Petitioner v. Federal Communications Commission, United States of America. Ms. Walker for the petitioners, Mr. Green for the respondents. Ms. Walker, good morning. Good morning, Your Honors. Helgi Walker for petitioners Sprint and T-Mobile. In this case, the FCC imposed $92 million in civil forfeiture penalties on my clients for privacy violations under Section 222 of the Communications Act. The FCC reached this result by applying an erroneous interpretation of the definition of Customer Proprietary Network Information, CPNI, that directly conflicted with everything it had said for the past 25 years. As then-Commissioner, now-Chairman Carr put it in dissent, quote, the FCC has reached beyond its statutory authority in these cases. And just two months later, the Supreme Court handed down Darkeese. That decision controls. The FCC's civil penalty regime violates the Seventh Amendment, just like Justice Sotomayor flagged in her dissent. But at a bare minimum, Your Honors, the orders here violate the well-established fair notice doctrine because they are based on, as FCC counsel told the circuit at oral argument just last month, quote, a new interpretation of the statute, quote, a new legal rule. And we did not have fair notice of that rule. Finally, the penalties violate the statutory cap. The FCC took what it determined it determined in the liability section of its order to be one continuing course of failure, the systemic, paragraph 48 of the T-Mobile order, systemic failure to have reasonable safeguards. And then when they got to the forfeiture section of the order, decided to break that up into 73 different violations for T-Mobile and 11 for Sprint. Whatever the FCC might be able to do under Section 503, it can't engage in a complete mismatch between the basis for liability and then the basis for the penalties. I'd like to start with the Seventh Amendment question, unless the court has issues it would prefer to focus on. There, Justice Sotomayor said the FCC's civil penalty regime would be upended by Darkeese, and we think she was right.  Why isn't it true that even if there is a jury trial right in this context, it was provided and waived because it was up to your clients to decide whether they wanted to just get a trial de novo by not paying this forfeiture? Understood, Your Honor. The availability, the theoretical availability of a 504 collection action does not solve the Seventh Amendment problem in this case. And before I get to that, I just want to note that the FCC made zero argument in its brief that we didn't have a civil penalty here within the meaning of that first factor under Darkeese, which the court said. So I'm assuming that you do have understood. I just want to point out that you didn't wait. Yes, I just want to point out they didn't even try to make that argument. Three reasons, Your Honor. First, there is no guarantee that DOJ will ever bring a collection action under 504. The statute simply says the forfeiture is, quote, recoverable. DOJ doesn't have to do anything at all. But that's good for your client, isn't it, if they don't? Well, it's not. It's not good, Your Honor, because we're caught between a rock and an even harder place. We had to choose between seeking review in this court of the legal questions on direct review under 402A by paying the penalty under protest to secure jurisdiction here, just like you told us to do in the AT&T case, or doing nothing, being branded a delinquent debtor to the United States and thinking maybe the Department of Justice would bring a collection action, which would be limited in certain jurisdictions to review only of the facts. But we just are focusing on this jurisdiction. In this jurisdiction, you would get a trial de novo on all issues, factual and legal. In passing, in some decisions, like action for children's television, the D.C. Circuit has pointed to the de novo language in the statute. But the Fifth Circuit's holding was crystal clear. I mean, we're the D.C. Circuit. So if something could have happened in another circuit, why does that affect my analysis here? Because the Department of Justice has a nationwide venue under Section 4. DOJ can bring these suits in any district where the carrier's line or system runs. The government, I would be willing to bet, is not going to sue us in a district where we have more rights than we do in the Fifth Circuit or the Ninth Circuit. But we can't be put to that kind of a... Are you suggesting the government's going to bring all of its compliance actions in the Fifth Circuit? I'm suggesting they have an incentive, like all good litigators. Have they done that since that opinion came out? Well, there have been very few collection actions, which is another point that I wanted to raise in terms of why this is totally theoretical. We might get a collection action. The Chamber amicus brief does a good job of saying that as far as we can tell, there's never been a jury trial in a Section 504 collection action ever. But the critical point, Judge Pan, is we can't be forced to choose between two core constitutional rights. On the one hand, the right to have a federal court of neutral decision-makers like this panel address what we think are the serious legal problems with the order. And on the other hand, the time-honored right to a jury trial, we can't be forced to choose. That's basic under the unconstitutional conditions doctrine and just plain old common sense. Am I right that in the Fifth Circuit, you would still have a jury trial on factual questions, right? I think so. I mean, I think so. I'm not sure. I've not been litigated, but yes. Right. And even then, so it does seem like you still have a jury trial right there in all the ways that matter. Well, with all respect... Don't determine legal questions. I think all the ways that matter include the constitutional violations, the statutory overreach, the penalty violations, and the arbitrary and capricious problems that this court has before it today. All the ways that matter under our Constitution includes the law under Article III and the facts and a jury trial under the Seventh Amendment. Yeah. And so I take the point about the reputational harms, but as you emphasized, the thing that triggers the jury trial, right, is the civil penalties. And I think the FCC would like us to think about the case as if those civil penalties are not even imposed unless and until a collection action comes. And so that reputational harms and even the collateral use of fact findings, those might be harms, but they don't trigger the Seventh Amendment. Why are they wrong? They are wrong because in paragraph one of the T-Mobile order, the FCC, quote, imposed a penalty on T-Mobile. And then in paragraphs one through nine through 111, they ordered T-Mobile to pay. This wasn't a casual suggestion like, hey, you might be liable or, hey, you might want to pay this $92 million. They ordered us to pay the forfeiture within 30 calendar days and then gave explicit instructions. Because I was curious, Judge Garcia, I pulled the SEC's final order that was on review in a new Jarkizi. It maps directly on top of the FCC's order. The SEC did the same thing. They imposed, and I'm quoting, paragraph 115A of the PEDAP in the SGCERT petition in Jarkizi. But that statutory scheme doesn't have this different feature. No. That you cannot pay it and wait for a complaint. Well, actually, the Securities and Exchange Act has a provision, section 20, that enforces for nonpayment of civil penalties. So it is exactly the same. Well, it's not exactly the same because I guess we have case law that says you can just do nothing at all and that's just fine. Well, with all respect, would you do nothing at all if it were your client, Judge Pan? We had to choose. We had 60 days to decide whether we were going to forego legal review in this court or wait for a collection action that might never happen where we might not have a full trial. But Judge Garcia's point was that you would still get legal review. Of the facts. No. I mean, if they're only doing facts in the Fifth Circuit, you're not forfeiting any legal arguments by not raising them in the district court. Well, why wouldn't you get to do the legal review in the Fifth Circuit as well as the factual review in the Fifth Circuit? Well, with respect, we would be because under Stevens, the court's holding was unambiguous. It says you must raise legal challenges to a forfeiture order on direct review under 402A. You may not raise them in a forfeiture order. We had a fork in the road and we can't be forced to choose between those rights. But I want to come back to your questions about 504, Judge Pan. And I want to compare this to to Jarkissi. There was no doubt in Jarkissi that the Seventh Amendment right attached when the SEC was, quote, seeking. That's 122 of the U.S. reporter pen site for Jarkissi because the SEC was seeking civil penalties. And then the SEC levied them. The chief used the word levied. Nobody in that case thought that the Seventh Amendment question was somehow premature. The agency had sought to impose the penalties and indeed impose the penalties over our objection, our careful preservation of this issue before the FCC. I find it an odd framing that the FCC has used here of waiver. There was absolutely no waiver of our jury trial rights. If you check the record, we submitted a long supplemental. Because you knew that you had two options. You could pay an appeal or you could wait for the, I guess, collections action. And then you would then get the trial de novo on all issues. No, we would not. So you made an affirmative choice. Well, with all respect, Judge Pan, we could not. How could we have banked on getting a trial de novo on all issues? But the thing is, if they don't bring it, though, it seems that, you know, you all the only injury that you claim does not entail you to a jury. I don't think so, Your Honor, because that is just if we had if we had let those 60 days go by, it wouldn't have just been reputational. The FCC has said that it can and it will use what it believes is the adjudicated finding, which would go find all the facts, but not the fact of the NAL. What is actually a provision that says we don't use that for anything?  The FCC has said in its 1997 forfeiture policy statement that it can and will use adjudicated findings against licensees in future. Penalty proceedings are not adjudicated. The FCC thinks it's adjudicated at paragraph 108 of the T-Mobile order. The FCC said we find that T-Mobile willfully and repeatedly violated Section 222. So Section 504C, use of notice of apparent liability in any case where the commission issues a notice of apparent liability looking toward the imposition of a forfeiture. That fact shall not be used in any other proceeding before the commission to the prejudice of the person to whom such notice was issued. Unless the forfeiture has been paid or a court of competent jurisdiction has ordered payment of such forfeiture and such order has been complied. Doesn't that prevent the FCC from using that NAL as you have stated they would? So the FCC hasn't made your argument, Judge Pan, but even if they had. I can't look at the statute. I'm just saying it's adversarial system and they haven't pressed that argument. And the reason why I think they haven't pressed that argument with all respect is that that is the notice of apparent liability. That's like a charging document. That's like a Wells notice in the SEC context. The FCC moved on to a final order, a final order that is before you today and found as a determination, as a matter of liability, that we had violated Section 222. And they can and they will. And they have said that they can use that against our company in future license proceedings. Wireless licenses are the lifeblood of any company like T-Mobile's. We could be denied a new license. So I just want to understand this, Ms. Walker. Yes. I'm not an expert as you are. But it seems to me that what they are saying is that they will not use the fact that they found liability against you unless you actually pay or there's an adjudication. And it seems to me that what you're saying is that the underlying facts can be brought up. But that could be brought up anyway, regardless of whether there's been any of this NAL or finding a forfeiture. Perhaps I'm not articulating it well, Judge Pan. But when the FCC makes a finding of liability, like it did in the final order, not the notice of apparent liability, when it makes a finding of liability, and I think my friends on the other side would not dispute that they made a finding of liability, that was the basis of the forfeiture order, that that finding, when it goes final, can be used against the regulated entity. The facts of the order, not just the facts underlying the order. The violation, the fact that you violated. So then if T-Mobile were to go to apply for a new wireless license, the FCC would say, we don't think that's in the public interest because you've violated Section 222 and you've done all of these bad things. But would it be based on the fact that they made the finding or just based on the facts that underlie the finding? I think I... The facts are fair game anyway, right? Well, I think the FCC would say if it's an adjudicated final finding, it can be used against us. It can also be a basis for a higher penalty. Can that count as an adjudicated final finding, though? Like, if you do not pay an appeal and you do not wait for the thing. It goes final. That would be like the broadcaster in Illinois Citizens who paid and didn't seek direct review and just let it go final after the 60 days. At that point, you're stuck. At that point, we're stuck with a final adverse order against us. It says we broke the law. We'd have to be delinquent on our debt. Okay. We don't have to pay it. So how can it have all of the significance where you can just wait for the compliance action or the collections action? Well, I don't think the FCC told us we don't have to pay it. But that's the way this whole structure works. You can either pay it an appeal or you can just not pay it and wait for the collections action. Like, our case law says you can do so. You can do nothing, and that's perfectly fine. We are at risk of losing our Article 3 right to have a federal court review the substantial legal problems. But it's not a legitimate choice is what I'm trying to say. It's a false choice. We can't. That's not what I'm asking about now. I'm just saying you're trying to say that there's so much significance that they found that this apparent liability. Yes, it was. I'm trying to say that it is not what you seem to suggest, that it is this fighting against you that's out there against your client when you don't have to pay it. That's what I'm saying. Well, whether we pay or not, I understand your question, I think. Whether we pay the forfeiture that we were ordered to pay or not, the FCC's finding of liability still stands. It goes final. If you let the 60 days to petition for review lapse, then it goes final. I'm just trying to understand the significance of that. I'm having trouble seeing why it's significant if you don't have to pay it. And they can still use the facts one way or the other, whatever they found. It's significant because we've been told that we've broken the law, and the FCC can use the finding that we have broken the law against us in other proceedings. It also imposes reputational harm and subjects us to disclosure obligations. But we shouldn't have to be – I mean, the FCC said pay us in 30 days. A 504 action is a collection action. It's for delinquent debtors. We are good corporate citizens. We don't blow off our debts to the United States. We pay, the FCC said, to pay within 30 days, so we did. If you do wait for the collection action, is there some monetary penalty for you putting the government to that burden? Is interest running? Are there other penalties for delay? I'm not sure, but I think interest does run. But we have no control, again, over whether there ever is a collection action. We have no control over where that's brought. Any good litigator would bring it in the Fifth Circuit or the Ninth Circuit or some other circuit where they thought they might – government might be able to prevail on that score. If the court's interested in hearing about statutory authority in the time that I have left, I'd be happy to quickly address that. Do you have any questions? We'll give you a couple minutes in reply. Okay, thank you so much. Mr. Grimm. Thank you. Thank you, Your Honors. Good morning, and may it please the court. I'm John Grimm on behalf of the FCC and the United States. Sprint and T-Mobile's right to a jury trial was not violated in this case. Under the Communications Act, they were not required to pay any monetary penalty, which is the focus of jargocy, unless they first had a de novo trial in district court. And while they chose to challenge the commission's decision directly in this court, that was their choice. It was not mandated by the statute that they claim is unconstitutional. I'd like to address several of the arguments that we just heard from Sprint and T-Mobile regarding why the existing procedure is insufficient. The first – well, I guess really the first two are that they have no guarantee over when this proceeding might be initiated and that this would somehow cause them to be branded a delinquent while they're waiting. This court has answered that question in both public broadcasting and action for children's television, where the court held that if a party is suffering a demonstrable injury as a result of some delay or failure to expedite a collections action, they could bring a declaratory judgment action themselves, and that would trigger the same level of review that they would get under Section 504. I'd also like to address the argument we heard that all of the points we're making about the FCC's statutory collections action would have applied to the SEC as well, because I don't agree with Carrier's reading of the relevant law there. In their reply brief on page – I believe it's page 6, they cite a Southern District of New York case. I'm going to attempt to pronounce it. I think it's Gerasimowicz, but it's on page 6 of their reply brief. That case outlines to some extent what an SEC collections action looks like, and it cites a Ninth Circuit case called SEC v. McCarthy, which goes into even greater depth. Those cases make it abundantly clear that when the SEC imposed a monetary penalty, the collections action was a summary proceeding. There is nothing remotely to suggest that it was a de novo trial that would entitle them to a jury. So the analogy to the SEC collections is, I think, incorrect. And I would also note that they cite several statutes in their reply brief on page 6, which they cite for the notion that there would still be a collections action in the SEC context. Those statutes relate to the enforcement of a court-imposed judgment under, as you recall from Jarkissi, the SEC could either do an in-house ALJ proceeding or it could go trigger a district court action directly. The statutes they cite in their reply brief refer to the collection of a court-imposed judgment if they went directly to court. That ALJ in-house versus court distinction, I think, is also significant because it relates to Justice Sotomayor's dissent in Jarkissi that we heard about when she talked about how that opinion would call into question SEC enforcement action. I believe she was talking about the FCC's ALJ proceeding, which is different from the proceeding that was at issue here and does not contain the de novo trial right. One of the arguments Sprinton made is essentially that assume the Fifth Circuit rule is the rule everywhere, that you're – yes, there is a right to a trial of the factual issues de novo, but to get to that, you have to waive your ability to seek review of all of the commission's legal determinations. Why isn't that a concern? It's not exactly a free choice to go to a jury. You've got to waive all your objections to the legal determinations. Sure. So several points in response to that question, Your Honor. The first is that I think that post-Jarkissi, it's questionable whether that decision by the Fifth Circuit would still stand. Obviously, this court can't change that, so we'll assume that it says what it says. What the carriers are asking this court to do is essentially invalidate as unconstitutional a statute based on their concern about what a hypothetical future case in a different jurisdiction might look like. If they are sued for a recovery action in a jurisdiction where they believe the law does not adequately protect their jury right, I think that the process would be for them to raise it in the first instance in that district court. But here, that never happened. They paid the penalty directly so that they could get to this court. And again, I believe under Pleasant Broadcasting and Action for Children's Television, I think if they did have a concern that the way that the government was going to bring a collections action might create a problem for it, I think they would still retain the right to bring a declaratory action and get the full judicial review that they think they're entitled to. So I think the concern about how a different jurisdiction might apply the law in an unknown case, I just don't think is a sufficient basis for this court to decide that the FCC's enforcement statute is unconstitutional. So I also would like to briefly address this question of waiver, because I know that the carriers dispute whether or not they've waived their right to a jury trial. And I just want to highlight that this court in Illinois Citizens Commission for Broadcasting, which we cite in our brief, described it in terms of waiver, saying that a jury trial was available but waived. I don't know that it's necessary to get into whether this was a waiver in the sense that if they elect a jury at trial, the court says, no, you waived it. I think what's important here, what the court is talking about is they had the option to get a de novo trial, and they chose to forego that option, whether you want to call it a waiver or just a decision to opt for a different procedural route. That's what they did here. So, your honors, I'm happy to continue discussing the jargony issue to the extent the court has questions. If not, I would like to turn to the statutory construction, if that would be something that the court is interested in hearing about. One thing I'm just wondering, right, is if we told, in federal court, you have a Seventh Amendment right to a jury. We have a new rule. In order to get a jury right, you have to waive your right to appeal any legal determination I make. It kind of seems like you're putting a pretty substantial burden on invoking your right. And if the Fifth Circuit rule were the rule everywhere, this case would seem similar to that. It might, your honor, but the Fifth Circuit rule is not the rule everywhere, and it's certainly not the rule here. In this circuit, they do have the right to challenge the underlying decision. They acknowledge that in their brief. Is that necessarily how the Fifth Circuit rule works? Because it just wasn't clear to me that the import of that meant that no legal findings or legal rulings could be appealed. It's just like the facts would go to trial, but does that mean you can't still make legal arguments on appeal? I don't think it does mean that, your honor. Right. So I think that what the Fifth Circuit held is that the district court doesn't have jurisdiction to challenge the or to hear a challenge to the legal validity of the FCC's order. But I don't see why once that district court order is a final judgment, it wouldn't be appealable just like any other final judgment of the district court. And presumably that would allow them to raise any challenges that they thought were wrong with the way that the trial was conducted, including the legal issues that were raised. But also legal issues not raised at trial. It just seems that that's not a subject of the trial. But I don't think you can deem legal issues waived if they weren't or forfeited if they weren't allowed to raise them in the trial. It just seems that just like this court can now look at the legal issues without a trial, the Fifth Circuit should be able to do so in whatever they're doing in the Fifth Circuit. I would agree with you, your honor, that if the court doesn't have jurisdiction to hear a legal issue, that doesn't mean that the party has forfeited it. So I would want to make sure. You understand the Fifth Circuit rule is that you if the party is in a trial proceeding, it cannot raise challenges to the legal validity of the FCC's order. Right. That that's how I understand the circuit law. Correct. So, as I said, if if the court would like, I would like to address the statutory arguments as well, because I think that under carriers reading of the CPI rule, they would essentially read it entirely out of existence. Wireless carriers like Sprint and T-Mobile have a unique relationship with their customers, and that exposes them to tremendously sensitive information. Congress instructed those carriers to keep that information safe. Under the carriers argument, that exact same information would no longer be protected simply because in addition to offering wireless voice services, the carriers also offered data service. And I think that it is not I just don't think that there's any way to read that statute as though Congress intended it to be so self-defeating. The key language in the definition of CPI that they've the carriers have focused on this solely by virtue language, but I think that the key language that's solely by virtue modifies is relationship. It's solely by virtue of the relationship that the carrier and the customer have. And I don't think that there's any dispute here that the relationship between Sprint and T-Mobile and their customers is the sole basis by which they had this information. So it seems to me that there's a carrier-customer relationship. Carrier refers to, I guess, telecommunications services, and there's this other sort of data aspect of it. But just because the carrier or the telecommunications company is offering both telecommunications and data services doesn't mean this is no longer a carrier-customer relationship. And if it's still a carrier-customer relationship, certainly all of this is based solely on that relationship. Yes, that's absolutely the commission's argument here. I think that's the best reading of the solely by virtue of the customer-carrier. I have a question about the penalties. I'd just like to hear your explanation of why the statute talks about a single act or failure to act. How do you explain why the relevant act here is third party by third party as opposed to the overall failure to have safeguards? Sure, Your Honor. I think that each third party had access to customer data through a unique set of circumstances. Certainly, T-Mobile at least had the ability to review and pre-approve any use case. The carriers had an individual ability to turn on or off at the third-party level access to data, which we saw happen when the Securus story broke. And so at any particular moment in time, any third party's access to customer data was its own unique circumstance. And the carriers' failures really were failures with respect to each individual third party. But it seems like a lot of those third parties abided by the honor system. They actually did get the customer consent. So it seems like now that you're breaking it down sort of carrier by carrier, it seems like some of them actually did what they were supposed to do, right? Or at least they weren't caught not doing it. I think that's fair, Your Honor. I think that it's important to emphasize sort of what specific violation the commission found. It wasn't that each of those carriers misused the data. It's that the carriers or that each of those third parties misused the data. It's that the carriers failed to take reasonable steps to make sure the data was being protected. So for each one of those third parties, the carriers claimed the right to conduct audits. They claimed the right to review use cases. But it turned out that they really weren't minding the shop. And what the commission found, as you used the phrase, the honor system, that that wasn't enough because it allowed some predictable abuses to take place. And so I understand that. And I think that that's a reasonable thing for the commission to do. But on the other hand, I think the carrier's position is that in the vast majority of cases, the system they had in place seemed to work. It seemed that even though they weren't taking responsibility for it, a lot of these third party carriers were getting customer consent before releasing this information. And that just makes it more. I just I think there are two different ways of looking at this. I don't think that what the commission is necessarily not reasonable, but I think they raise a strong argument that their reliance on the honor system was not crazy, given that in the vast majority of cases it worked. And so this seems like a pretty harsh penalty, given that in the vast majority of cases, what they did was fine. Apparently fine. Well, your honor, let me. Let me. Let me get it from this angle, then the. While it may or may not have been reasonable to rely on most of these companies following the rules, and it sounds like many of them did what the commission found was unreasonable, is that when it became public that there was this vulnerability that allowed certain third parties to misuse data that the approved use case system could be manipulated. When these failures became public, the commission found that the carriers didn't take adequate steps to investigate the extent of the problem to determine whether or not it affected other carriers. It didn't take steps to make sure that the customer consent procedures were valid. And, you know, and again, this goes somewhat to their argument that they were penalized for not shutting down the entire program. That's not accurate. They were penalized for not taking adequate steps, really, of any kind. And so I think that once it was made known that the security incident occurred, I think that the reasonable that that put them on notice of was the potential for serious problems. The question is just whether that lapse is one violation versus one across every carrier. And it just seems, I mean, did they treat micro built the same as all the other carriers? Because basically the, the formula they did was $40,000 for the first day you didn't implement something more effective and then 2,500 for every day after that. And it does seem strange if they would treat micro built where there actually was a misuse the same as every other company. Did they treat them the same? Yes, your honor. It was it was every third party, as you said, $40,000 for the first day and 1,500 for each additional day. Interestingly, I don't believe that the carriers challenge either of those numbers. I don't understand them to be saying that the $40,000 for the first day was a problem or that that's not my question either. I'm just saying, like, the fact that you're doing it carrier by carrier versus it was a lapse not to implement something better. And once you're going carrier by carrier, it does look a little arbitrary to treat micro built the same as everybody else when they actually misuse the data and the others didn't. And then my other question is, what about this variance? Like, what's the basis of 100% for one and 75% for the other? That seems plucked out of the air. Well, your honor, that all I can say to that is that there's a number of factors that the commission looks at when it makes these adjustments. I understand. But how do you get to 75% for one and 100% for the other? That that's a discretionary determination by the commission based on all the facts that it looks at, the level of culpability. And, you know, I just think that that's a judgment call that the commission has to make that the regulations are and the statutes are set up to allow them to make. I see, but it just seems to take away from you've come up with a formula and the formula seeks to. Make this something somewhat logical and analytical, and then you can tack on any variance you want to double it or make it 75% greater. I mean, that does seem a little like it gives the commission a lot of power just to make these penalties, whatever they think they should be. Well, your honor, I certainly think the commission has great discretion here, and they found that the carrier's conduct in these cases was particularly egregious, which justified the upward departure. Certainly take your point, your honor. I think it's, it's ultimately just, it's a matter of any explanation as to why one is 100 and one is 75%. The orders don't discuss the penalties with respect to other carriers penalties, so they don't know there's no. But I mean, I guess T-Mobile was 100%, I think, and Sprint was 75%. Correct. So why those two numbers for each of those carriers? The order doesn't explain why it was 75% as opposed to 100 for Sprint and why it was 100 as opposed to 75% for T-Mobile. For each carrier, it's the multiplier is justified only with respect to that particular carrier and the level of egregiousness of their conduct. You don't think that they should have to just say why they chose 100 versus 75 or 50 or 25? Well, I think that they explained holistically what their calculation was and the factors that they considered to get there. I don't know that they necessarily are required to explain why the number for one carrier would be. Well, just why is it 100 for this carrier? It just seems, isn't it by definition arbitrary to pick 100 and not say why it's 100? Well, I don't think that they, I mean, they justified it by pointing to the egregiousness of the carriers. I understand, but why 100? It's egregious, we should do a variance, but why 100 versus 200 or 300 or 50? Your Honor, they didn't specifically address why it was 100 versus 75. So why is that okay? Why is that okay? Well, because I think the court has to look at the overall total forfeiture to determine whether it's reasonable. And I think that in this case, given the egregiousness and the duration of the carrier's conduct, it warranted a significant upward adjustment. All right. Thank you. All right. Thank you, Your Honor. Thank you, Your Honors. I do have three points I'd quickly like to make, and I'll be as efficient with my time as I can be. First, on statutory authority, Mr. Grimm just said that this information was covered because of the relationship. But that's not what the statute says. The statute says the carrier-customer relationship. That is the common carrier-voice services relationship. And when a wireless company is providing both voice and data service, you asked about this, Judge Pan, isn't it still part of the carrier-customer relationship? Respectfully, no, under the definitions in the Communications Act. So it's no longer a carrier-customer relationship if they also provide data? Yeah, or if there are data-only plans. I understand data-only, but if there's a carrier that provides both, it's definitely a carrier-customer relationship. But why does it cease to be a carrier-customer relationship if they also provide data? For two reasons, Judge Pan. 15351 in Title 47 says in the definition of a telecommunications carrier, and this is a little technical but really important to this whole area of the law and this case, that a telecom carrier shall be treated as a common carrier only to the extent that it is engaged in providing telecom services. So where we are not providing telecom services, we are not a common carrier, we do not fall under Title II, and we definitely don't fall under Section 222. But does that answer why a carrier-customer relationship changes and is no longer a carrier-customer relationship if the carrier provides both telecom and data? Because we're wearing two hats, essentially. We are wearing a common carrier hat to a limited extent, but where we are doing other things, we can only be treated as a common carrier to the extent we are doing voice service. No, I understand what you're saying, but the specific wording of the statute is carrier-customer relationship. Yeah. And I'm wondering why a carrier-customer relationship changes if the carrier also provides data services. It's definitely a carrier-customer relationship because they are providing telecommunication services. If you add on to that, why does that change the relationship? Right. Well, as an initial matter, there are some customers who have data-only plans. They're not in any carrier-customer relationship at all. But for customers that have both voice and data, we are in the carrier-customer relationship under 222 when we are providing traditional voice services. But we are in an information services-customer relationship when we're doing data, and the information here partook of both. So you think the statute should have said carrier and data provider services-customer relationship? Well, with respect, it didn't need to do that, Your Honor, because the definition of telecom carrier tells us that when you're doing both kinds of services, you only fall on the common carrier side of the line when you're doing the common carrier service. But there's another reason why, Judge Pan. The statute says solely. Congress really tried to lock this down? I'm focused on the relationship because I think it is solely because of the relationship, and I don't understand why it's no longer a carrier-customer relationship if data is also supplied. Because I understand the distinctions you're making, but we have to focus on the relationship. Is it a carrier-customer relationship? Yes. We are not in a carrier-customer relationship when there's data information. And 15351 tells us that. This court's decision in Mozilla, one of the net neutrality cases, explains the difference between telecom carrier status and information service status. The Sixth Circuit just explained it in the other case. I would like to get to the fair notice point because even if you are not persuaded by our absolutely exciting and correct statutory argument, we do think that at a bare minimum, a narrow holding here is that we didn't get fair notice of that. The FCC, my good friends, told the Fifth Circuit that this was a new legal rule, the definition of CP&I, that was announced for the first time in this proceeding. It went against everything the FCC has ever said about the scope of CP&I for literally the past 25 years. So whether or not it's a permissible reading of the statute, it's definitely not one that we knew about. The FCC, on top of contravening its past guidance, refused to give industry any clarity when we asked for it. They knew that industry was reading the statute this way. We filed many, many comments saying 222 only applies to voice services. And the FCC sat on its hands for eight months after it learned of the Securus incident and did absolutely nothing. So I think if you stack up those five factors, we had at least a reasonable reading. The FCC's new reading goes against everything it ever said. New industry was reading it this way. They did nothing, and they refused to give us any clarity at a bare minimum that does violate this circuit's well-established and seminal fair notice precedents. On penalties, my friend on the other side said that the carriers failed to have reasonable means, and that's our point on the penalty analysis. Whatever an agency might be able to do with respect to civil penalties, our modest proposition is that it cannot, on the one hand, find liability based on a systemic failure to act. And then when you get to the penalties section, say, oh, it's not one failure. It's 84 different failures. There never was any aggregator or provider by provider analysis in the liability section, and then they completely switched gears when they got to the penalties section. There is no limiting principle to the FCC's view of what they can do under Section 503. They said in the order, well, you're lucky because we could have used customers as the denominator for the penalty. That would have resulted in forfeitures in the amount of several hundred trillion dollars. Our national debt is only $36 trillion. That can't possibly be right. Finally, Judge Pan, you were asking some questions about why the penalty isn't arbitrary and capricious. We think that it is, and I heard Mr. Grimm concede that the orders do not explain why this one of the highest penalties ever in the history of the FCC was proportionate and rational in light of the kinds of penalties they have historically imposed. Those penalties have been historically imposed fraud and actual harm. I will remind you there's no allegation of fraud. There was zero findings of any actual harm here, and they never explained that. Your decision in Freedman is on point on both scores. Unless the court has any other questions, I will take my seat. Thank you. Thank you so much.
judges: Henderson; Pan; Garcia